# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| **PERLEY WINKLER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:14-cv-00509** |
| | ) | **REEVES/GUYTON** |
| **DAVID SEXTON, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Perley Winkler ("Petitioner"), an inmate at the Morgan County Correctional Complex, brings this pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the legality of his confinement pursuant to a 2008 judgment issued by the Monroe County Criminal Court [Doc. 2]. Petitioner has also filed a memorandum in support of his § 2254 petition [Doc. 2-1]. Respondent filed a response in opposition thereto [Doc. 15], as well as a copy of the state record [Doc. 13]. For the reasons set forth below, the Court determines that no evidentiary hearing is warranted in this case, Petitioner's § 2254 petition [Doc. 2] will be **DENIED**, and this action will be **DISMISSED**.

## I. PROCEDURAL HISTORY

In 2008, after a jury trial, Petitioner was convicted of two counts of attempted first degree murder and one count of attempted aggravated arson, and sentenced to 40 years in prison [State Court Record, Attachment 1 p. 12–14]. The judgment was affirmed on direct appeal by the Tennessee Court of Criminal Appeals ("TCCA"). *State v. Michael Aaron Jenkins*, No. E2008-

02321-CCA-R3-CD, 2011 WL 578593 (Tenn. Crim. App. Feb. 17, 2011), *perm. app. denied* (Tenn. May 25, 2011).[1]

On March 28, 2011, Petitioner filed his pro se petition for post-conviction relief, pursuant to Tennessee Code Annotated § 40-30-101, *et seq.*, in the Monroe County Criminal Court [State Court Record, Attachment 12 p. 946]. He was thereafter appointed counsel, and the petition was twice amended [*Id.* at 1042]. After an October 16, 2012 evidentiary hearing, the Monroe County Criminal Court denied the amended petition on November 12, 2012 [*Id.* at 1053]. The TCCA subsequently affirmed this denial on February 10, 2014, and the TSC denied permission to appeal on July 16, 2014. *See Perley Winkler, Jr. v. State*, No. E2012-02647-CCA-R3-PC, 2014 WL 545479 (Tenn. Crim. App. Feb. 10, 2014), *perm. app. denied* (Tenn. July 16, 2014).

On October 29, 2014, Petitioner filed the instant petition for a writ of habeas corpus in this Court [Doc. 2]. Respondent—Warden David Sexton—thereafter filed an answer to the petition, arguing that Petitioner's claims were all procedurally defaulted or without merit [Doc. 15]. This matter is now ripe for the Court's review.

## II.    BACKGROUND

The following factual background is taken from the TCCA's opinion on Petitioner's appeal of the denial of his petition for post-conviction relief:

> A Monroe County Criminal Court jury convicted both the petitioner and Michael Aaron Jenkins of two counts each of attempted first degree murder and one count each of attempted aggravated arson. The trial court sentenced the petitioner to 40 years' incarceration. This court affirmed the judgments on direct appeal. *See State v. Michael Aaron Jenkins and Perley Winker, Jr.,* No. E2008–02321–CCA–R3–CD, slip op. at 1 (Tenn. Crim. App., Knoxville, Feb. 17, 2011), *perm. app. denied* (Tenn. May 25, 2011).

---

[1] The Tennessee Supreme Court ("TSC") denied Petitioner's co-defendant's application for permission to appeal on May 25, 2011. Petitioner did not file a Rule 11 application on direct appeal.

In *Michael Aaron Jenkins and Perley Winkler, Jr.,* this court summarized the facts of the case as follows:

> John David Senn testified that about 4:00 a.m. on April 17, 2007, he was awakened by one of his pit bull dogs. Senn got up to let his dog outside, looked out the small window in his back door, and saw two men in the yard. One man was standing behind Senn's station wagon and was pouring gasoline from a red gasoline jug onto the car. Senn said that the man was standing "right there at my back door" and that he recognized the man as "Spanky," Michael Aaron Jenkins. Senn stated that the second man was standing behind Senn's Oldsmobile 442, that the man was wearing thick glasses, and that he recognized the man as Perley Winkler, Jr. Senn said that the yard was welllit by his back porch light and an outdoor utility light, that he got a clear view of the appellants for about five seconds, and that he saw Jenkins' side profile and Winkler's full face. Senn had seen the men one or two times previously. He said Jenkins was wearing a baseball cap with a rebel flag on it and a black jacket; he thought Winkler was wearing a black baseball cap. He said he had not given either of them permission to pour gasoline on his cars.
>
> Senn testified that Jenkins dropped the gasoline jug and that the appellants ran into the woods. Senn woke his girlfriend, Sherri Turpin, and told her to call the police. He said he was "terrified" and grabbed his gun off the shelf above the stove. Senn walked onto the back porch and began shooting into the woods. Senn said that he fired eight shots, emptying the clip in his pistol, and that the gas fumes were burning his eyes. He said he heard a car start on Niles Ferry Road and "take off." Senn saw that the appellants had "gassed" his jacuzzi, the back porch, the side of the house, and both cars. One of the Oldsmobile's doors was open, and gasoline had been poured inside the car. Senn had never had any personal problems with either of the appellants. However, he said that Turpin's family was involved in an ongoing feud with Winkler and that Turpin's brother, Steve Abercrombie, "had quite a few problems" with Winkler. When the police arrived at the scene, Senn told them what had happened and that Jenkins and Winkler were responsible. While Senn was talking with the police, he drank a beer to calm his nerves. Later, he picked out the appellants' photographs from a photograph array.
>
> On cross-examination, Senn acknowledged that while Turpin was on the telephone with the 911 operator, he was giving information to Turpin. He also acknowledged that Turpin told the operator about only one man, described by Turpin to the operator as a person "with coke bottle glasses." Senn acknowledged that on the 911 tape, he

could be heard saying the man was wearing "black britches and a green shirt." Senn told the police that one of the men was wearing an Atlanta Braves baseball cap but testified at the preliminary hearing that he saw a cap with a rebel flag on it. Regarding the man wearing the Atlanta Braves cap, Senn told the police he saw the man's "side view" for only two or three seconds. Upon being questioned by defense counsel about these discrepancies, Senn explained, "It all happened real fast."

Clara Hitson, the Department Head of Monroe County 911, testified that Sherri Turpin's 911 call was recorded. The State played the recording for the jury. During the call, Turpin told the operator, "I seen a guy running with a gas jug and I think it was Junior Winkler." She also told the operator, "I think he was trying to burn me out"; "I'm the sister of the guy he's wanting"; and "To get to my brother he would hurt me."

*State v. Michael Aaron Jenkins and Perley Winkler, Jr.,* slip op. at 2–3 (footnote omitted).

\* \* \*

On March 28, 2011, the petitioner filed, pro se, his initial petition for post-conviction relief, which petition was amended. Following the appointment of counsel and the amendment of the petition, the post-conviction court held an evidentiary hearing.

The petitioner testified that trial counsel was appointed to represent him when he was arraigned on the charges in the instant case. The petitioner recalled meeting with trial counsel one time at the jail for approximately 15 to 20 minutes prior to his preliminary hearing. At that meeting, the petitioner and trial counsel reviewed the petitioner's search warrants, and trial counsel indicated that he thought the search warrants "were good."

The petitioner testified that he expressed his disagreement with trial counsel's position. The petitioner stated that he had also requested that trial counsel subpoena some "people from the church," but trial counsel apparently disagreed and did not subpoena the requested church members. Between the preliminary hearing and the trial, the petitioner saw trial counsel only "a couple of times." On one of those occasions, trial counsel was accompanied by an investigator.

With respect to the truthfulness of Mr. and Mrs. Senn, the petitioner testified that trial counsel "said he thought that [the Senns were] lying about some stuff but he didn't do much to prove anything different." The petitioner testified that, once trial counsel was appointed to his case, trial counsel did not visit him for a few months and that once he did visit, he explained his absence by stating "to tell you the truth

I don't make that much money on these appointed cases and I feel like I have paid my dues in small court." The petitioner stated that trial counsel failed to appear for "a couple" of his court dates, prompting the petitioner to request that the trial court dismiss trial counsel as his attorney, which the court refused to do. When trial counsel visited the petitioner at the jail shortly thereafter, trial counsel was surrounded by several police officers, and he explained that the officers "feel like you are going to hurt me." At that point, the petitioner expressed to trial counsel how he felt about counsel's failure to appear for his hearings as well as his belief that counsel was "not taking [his] case to[o] seriously." According to the petitioner, trial counsel stated that, because the trial court refused to let him withdraw from the case, he intended "to do what he could" but that "there wasn't much conversation" with the petitioner after that time.

The petitioner stated that he could not recall trial counsel's ever discussing trial strategy with him; that counsel failed to provide him with a complete copy of his file prior to trial; and that counsel did not review discovery documents with him. The petitioner testified that trial counsel had never discussed with him a notation in the State's file that Mrs. Senn was refusing to testify "unless she was paid to relocate."

During the trial, Mrs. Senn testified that she had not heard from the petitioner in the past five years because he "had been in prison." Following this statement, trial counsel advised the petitioner against moving for a mistrial, assuring the petitioner that "he liked the way the trial was going and he didn't think they would find me guilty."

Following the trial, the petitioner spoke with trial counsel once over the telephone, but he could not recall if the conversation took place before or after the motion for new trial. The petitioner identified a letter he wrote to trial counsel on March 15, 2009, in which he inquired about his appeal and the issues that trial counsel intended to raise on appeal. The petitioner testified that trial counsel never responded to this letter and that trial counsel finally wrote to the petitioner to notify him that his appeal had been denied. The petitioner wrote several additional letters to trial counsel, and the petitioner testified that trial counsel did not respond.

On cross-examination, the petitioner acknowledged that he takes a "very active role" in his cases, that he conducts legal research on his cases, and that he "put[s] forth some arguments" that contain "novel" theories. The petitioner agreed that "it is generally the attorney's job to take some of the arguments that you propose and figure out which ones are the best to go with in court." The petitioner was "pretty sure" that trial counsel sent him no correspondence between the petitioner's arraignment and jury trial.

Lisa Abercrombie, John Senn's sister-in-law, testified that she played a voicemail message for Sherri Turpin Senn in which the petitioner threatened Mrs. Abercrombie's life. Mrs. Abercrombie stated that she informed law enforcement

officers about the voicemail message, but she did not turn the message over to the police.

Andrew Freiberg testified that he was the assistant district attorney who prosecuted the petitioner in the underlying case. Mr. Freiberg testified that the district attorney's office had an "open file discovery policy," which permitted defense attorneys "to inspect and make a copy of our complete file." Mr. Freiberg explained that nothing was withheld from defense counsel under this policy. As a practical matter, the right side of the file contained "all materials, including the indictment," and the left side of the file contained "things like witness list and work product." Defense attorneys would arrange a time to come to the district attorney's office to review the file, or the attorneys could request that the office make a photocopy of the file for defense counsel. With respect to a document in the petitioner's file entitled "Victim Assistance Program/Victim Contact Information," Mr. Freiberg confirmed that it would have been on the left side of the file. Mr. Freiberg testified that only one file existed in any case in the district attorney's office and that all information contained within those files was discoverable.

On cross-examination, Mr. Freiberg testified that the voicemail message in question did not exist at the time of trial, but he recalled that the voicemail message had been referenced or "alluded to at the time of the preliminary hearing of which [trial counsel] took part in." With respect to Mr. Senn's credibility, Mr. Freiberg specifically recalled that Mr. Senn recognized the petitioner immediately when he saw him standing outside his residence on the morning of April 17 and that he "saw [the petitioner] dead in the face, straight on, for a number of seconds."

MCSD Captain Travis Jones testified that he showed Mr. and Mrs. Senn a photographic lineup on April 17, but he did not recall now many photographs it included. He stated that "the standard number is usually six different photos on one piece of paper."

Trial counsel testified that he had been a licensed attorney for approximately 14 years and that he had "done a lot of criminal defense work" but that it was "not [his] primary area these days." Trial counsel admitted that he had been appointed to represent the petitioner in the instant case as well as a few additional cases. Trial counsel did not recall how many times he visited the petitioner prior to the preliminary hearing in the instant case, noting that, on occasion, he "would get appointed and potentially meet with that person just that morning." With respect to the Senns' credibility, trial counsel testified that he attempted to impeach them through inconsistent statements and their motives for testifying, given their apparent dislike for the petitioner. When questioned about his trial strategy, trial counsel responded that his goal was to show the jury that the Senns "either made a bad identification or they lied" to establish reasonable doubt.

Trial counsel reviewed the document entitled "Victim Assistance Program/Victim Contact Information," which indicated that Mrs. Senn "says if she gets no help to

relocate she will not testify at trial." Trial counsel stated that he could not recall if he had ever seen that document on a prior occasion, but he acknowledged that it could have been potentially important in his cross-examination of Mrs. Senn. Trial counsel could not recall if he had ever received a photographic lineup through the discovery process, and, with respect to the voicemail message, he could only recall that the petitioner had made a threat against the victims' family member and that he "objected to that evidence being introduced most strenuously." Trial counsel testified that he had visited the district attorney's office and had spent time reviewing the petitioner's file and making copies. Trial counsel noted that the trial court had appointed investigators to assist him and stated that some of those investigators had likely assisted him in obtaining some of his information.

Trial counsel testified that he spoke with the petitioner "several times" at either the Monroe County jail or over the telephone and that his investigators spoke with the petitioner "several times." Trial counsel reported that the petitioner "was a very compliant client who . . . worked hard on his case and we worked hard with him." Counsel testified that his "philosophy on [the petitioner's] case was to get up early in the morning, stay late at night, and that's been my philosophy on every jury trial I've ever tried and I can tell you that that's what I did in this instance in preparing for the trial." Counsel emphasized that he was "always willing to meet with [the petitioner]" and that when the petitioner wished to speak with him, he "was never not receptive." When asked about the occasion when the petitioner requested the trial court to appoint him new counsel, trial counsel responded that he "[did] not remember that time at all." Trial counsel did recall being escorted by armed law enforcement officers to a visit with the petitioner at the jail, but he stated that he had not requested the officers and that he had never felt threatened by the petitioner. Trial counsel also did not recall stating that he did not have time for the petitioner's case because he was involved in "some serious federal matters." Counsel admitted that he was defending a multimillion-dollar lawsuit during his representation of the petitioner and, therefore, if he had made a statement about not having enough time for the petitioner, "it would have been [an] accurate statement."

Trial counsel recalled that Mrs. Senn, during her trial testimony, had made a statement about the petitioner's having spent the past five years in jail, and he recalled discussing the possibility of requesting a mistrial at that time. Trial counsel testified that he and the petitioner made the joint decision to continue with the trial because the trial court had instructed the jury "that they were not to consider that statement, that that was to be stricken from the record." Furthermore, trial counsel believed a request for a mistrial to be unnecessary because he felt that the trial was going well for the defense, and counsel testified that the petitioner "had a strong opinion that we should allow this case to go to the jury." When asked why he chose not to object during the prosecutor's closing argument to statements made about the credibility and veracity of the victims, trial counsel responded that it was a strategic move and that he believed some of the prosecutor's statements actually benefitted the petitioner.

With this evidence, the post-conviction court denied relief. The court specifically found that the petitioner failed to prove, by clear and convincing evidence, that the State suppressed any exculpatory evidence or that said evidence was unknown to trial counsel, and it further found that the petitioner failed to prove by clear and convincing evidence that trial counsel's representation was deficient.

*Winkler*, 2014 WL 545479, at *1–6 (footnote omitted).

## III.   STANDARD OF REVIEW

The Court must review Petitioner's request for habeas corpus relief pursuant to the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows state prisoners to seek federal habeas corpus relief on the ground that they are being held in custody in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254; *Reed v. Farley*, 512 U.S. 339, 347 (1994).

For any claims that have been adjudicated on the merits by the state court, however, federal courts must utilize a "highly deferential" standard of review.  *See, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 88–89 (2011).  Under the AEDPA, a court considering a habeas claim must defer to any decision by a state court concerning the claim, unless the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)–(2).

"Clearly established federal law," for the purposes of § 2254(d)(1), refers to rulings of the United States Supreme Court in place at the time of "the last state-court adjudication on the merits."  *Greene v. Fisher*, 565 U.S. 34, 40 (2011); *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) (defining clearly established federal law as "the governing legal principle or principles set

forth by the Supreme Court at the time the state court renders its decision"). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state-court decision unreasonably applies clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The standards set forth in the AEDPA are "intentionally difficult to meet." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)); *see also Harrington*, 562 U.S. at 102 ("If [§ 2254(d)] is difficult to meet, that is because it was meant to be."). Further, where findings of fact are supported by the record, they are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Ultimately, the AEDPA's highly deferential standard requires this Court to give the rulings of the state courts "the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

## IV.   ANALYSIS

Petitioner's § 2254 habeas petition [Doc. 2] raises various grounds for relief, some of which Petitioner has procedurally defaulted. The Court will address the procedurally defaulted claims before addressing the remaining claims in turn.

### A.      Procedurally Defaulted Claims

First, Respondent argues that many of Petitioner's claims are procedurally defaulted [Doc. 15 p. 15–20, 22–23, 24–28, 30]. Specifically, Respondent asserts that Petitioner has procedurally

defaulted the following claims by not raising them in his appeal of the denial of his petition for

post-conviction relief:

1. Petitioner's claim that his conviction was obtained by the action of a grand jury which was unconstitutionally selected;

2. Petitioner's claim for ineffective assistance of counsel based on the failure to research and challenge the constitutionality of the indictment due to racial and gender discrimination in the selection of the grand jury foreman;

3. Petitioner's claim for ineffective assistance of counsel based on the failure to object to the use of a shock belt on Petitioner during trial;

4. Petitioner's claim for ineffective assistance of counsel based on the failure to obtain documents that the prosecution says were available;

5. Petitioner's claim for ineffective assistance of counsel based on the failure to use the victim's inconsistent testimony from the preliminary hearing; and

6. Petitioner's claim for ineffective assistance of counsel based on the failure to present issues in the motion for new trial to preserve them for appeal.

[*Id.*].

A federal district court generally cannot entertain a petition for writ of habeas corpus unless

the petitioner has first exhausted all available state court remedies for each claim in his petition.

28 U.S.C. § 2254(b)(1). Once the petitioner's federal claims have been raised in the highest state

court available, the exhaustion requirement is satisfied, even if that court refused to consider the

claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).[2] Conversely, a petitioner who

fails to raise his federal claim in the state courts, and who is now barred by a state procedural rule

from returning with the claim to those courts, has committed a procedural default. *See Coleman*

*v. Thompson*, 501 U.S. 722, 732 (1991). A procedural default forecloses federal habeas review,

---

[2] In Tennessee, a petitioner need only take his claims to the Tennessee Court of Criminal Appeals in order to fully exhaust his available state court remedies. Rule 39, Tenn. Sup. Ct. Rules; *see also Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (noting that Rule 39 clearly removed Tennessee Supreme Court review as an antecedent for habeas review).

unless a petitioner can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation, *id.* at 732, or where the petitioner demonstrates that he has "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

In his state post-conviction petition, Petitioner raised the aforementioned claims of ineffective assistance of counsel and an alleged unconstitutional grand jury [*See* State Court Record, Attachment 12–Pro Se Petition for Post-Conviction Relief]. However, on appeal to the TCCA from the denial of his post-conviction petition, Petitioner failed to mention the above-listed claims. [State Court Record, Attachment 17–Brief of Appellant on Post-Conviction Appeal].

Respondent asserts that these claims are procedurally defaulted, Petitioner cannot establish cause for the default, and, further, that Petitioner cannot establish actual prejudice as a result of the alleged violations [Doc. 15 p. 20, 22–28, 30]. Specifically, Respondent argues that the above-listed claims are procedurally defaulted and barred from review because Petitioner did not raise the claims on direct appeal of the denial of his post-conviction relief [*Id*]. As a result, Respondent argues that these claims are now barred from presentation to the state courts by the statute of limitations under Tennessee Code Annotated § 40–30–102(a) and the "one petition" limitation of § 40–30–102(c) [*Id.*]. However, Petitioner claims that the ineffectiveness of post-conviction counsel resulted in the procedural default of his claims [Doc. 2–1 p. 46–47].

If a § 2254 petitioner failed to raise a claim on appeal, and thereby violated a state procedural rule, "that claim is subject to procedural default and will not be reviewed by federal courts unless the petitioner demonstrates cause and prejudice for the default." *West v. Carpenter*, 790 F.3d 693, 697 (6th Cir. 2015). Because Petitioner is barred from returning to the state court

on these claims, they have been procedurally defaulted and are not reviewable on habeas unless

Petitioner can show cause to excuse his failure to comply with the state procedural rules, as well

as actual prejudice.

Ordinarily, "attorney error in state post-conviction proceedings 'cannot constitute cause to

excuse [a] default in federal habeas'" because there is no constitutional right to an attorney in those

proceedings. *West*, 790 F.3d at 697 (quoting *Coleman*, 501 U.S. at 757). However, in *Martinez*

*v. Ryan*, 566 U.S. 1 (2012), the Supreme Court established a narrow exception to the *Coleman*

rule, holding that:

> [w]here, under state law, claims of ineffective assistance of trial counsel must be
> raised in an initial-review collateral proceeding, a procedural default will not bar a
> federal habeas court from hearing a substantial claim of ineffective assistance at
> trial if, in the initial-review collateral proceeding, there was no counsel or counsel
> in that proceeding was ineffective.

566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (extending the *Martinez*

exception to states whose procedural requirements make it "virtually impossible" to present an

ineffective assistance claim on direct appeal, even if no outright prohibition exists). The Sixth

Circuit subsequently held that the *Martinez-Trevino* exception is applicable in Tennessee because

Tennessee's procedural framework directs defendants to file ineffective assistance claims in post-

conviction proceedings, rather than on direct appeal. *Sutton v. Carpenter*, 745 F.3d 787, 795–96

(6th Cir. 2014).

However, a petitioner cannot use the ineffective assistance of counsel at the post-conviction

*appellate* stage to excuse a procedural default, because it is not an initial-review collateral

proceeding. *Wallace v. Sexton*, 570 F. App'x 443, 453 (6th Cir. 2014). The *Martinez* Court

explicitly held that the narrow exception it carved out "does not extend to attorney errors in any

proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective

assistance at trial." *Martinez*, 566 U.S. at 16 (stating *Coleman* "held that an attorney's negligence in a post-conviction proceeding does not establish cause, and this remains true *except* as to initial-review collateral proceedings for claims of ineffective assistance of counsel at *trial*"). Specifically, the *Martinez* exception does not apply to claims that were raised at the post-conviction initial-review proceeding but not preserved on post-conviction appeal. *See, e.g.*, *West v. Carpenter*, 790 F.3d 693, 698–99 (6th Cir. 2015) (holding that "attorney error at state post-conviction appellate proceedings cannot excuse procedural default under the *Martinez-Trevino* framework").

As set forth above, Petitioner did not properly raise these claims in his appeal of the denial of his post-conviction petition. Due to this failure, the above-listed claims have been procedurally defaulted. Additionally, Petitioner cannot establish cause, as the *Martinez* exception does not apply to excuse Petitioner's default of these claims. *See Wallace*, 570 F. App'x at 453. Accordingly, because these claims have been procedurally defaulted, and Petitioner cannot establish cause, the above-listed claims will be **DISMISSED**.

**B.** **Petitioner's *Brady* Claim**

Petitioner contends that the State withheld material, exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Petitioner claims that the prosecution improperly withheld a photo line-up shown to the victim [John David Senn], from which he identified Petitioner, as well as a contact note from the District Attorney's file stating "victim's [Sherry Turpin Senn] refuse[d] to testify unless state helps them relocate" [Doc. 2 p. 4]. Respondent contends that the state court's rejection of Petitioner's *Brady* claims was not an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of fact [Doc. 15 p. 12].

The Due Process Clause of the Fourteenth Amendment requires that the state disclose to criminal defendants "evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Brady*, 373 U.S. at 97). "Even in the absence of a specific request, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Trombetta*, 467 U.S. at 485 (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

To establish a *Brady* claim, a petitioner must show that the state withheld exculpatory evidence material to either the petitioner's guilt or punishment. *Brady,* 373 U.S. at 87. The Supreme Court has articulated three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia,* 547 U.S. 867, 870 (2006) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Pennsylvania v. Ritchie,* 480 U.S. 39, 57 (1987) (internal quotation marks omitted).

Petitioner presented this claim on direct appeal, and the TCCA analyzed it as follows:

In the instant case, Mr. Freiberg, the prosecutor at trial, testified that the document containing the statement about Mrs. Senn was located on the left side of the prosecutor's file and that, pursuant to the office's "open file discovery policy," all materials in that file were discoverable. Trial counsel could not recall having seen that document and stated that, although he did review and make copies of the petitioner's file, investigators who worked on the case likely assisted him in obtaining copies of information in the file as well. With respect to the photographic lineup, Captain Jones testified that he showed the lineup to the Senns, but he could not recall how many photographs it contained. Trial counsel did not recall whether he had received the lineup material during the discovery process, and the

photographic lineup was not submitted as an exhibit at trial. Nothing in the record indicates that the State suppressed either the document pertaining to Mrs. Senn or the photographic lineup. Moreover, with respect to the lineup, the petitioner has failed to demonstrate that it was material or favorable to his defense. Before viewing the lineup, Mr. Senn had already identified the petitioner to the 911 operator as one of the two men he had seen behind his house. As such, the defendant has failed to establish a *Brady* violation.

*Winkler*, 2014 WL 545479, at *7–8.

The TCCA appropriately rejected Petitioner's *Brady* claim, finding that the State had not suppressed either of the challenged items, and that Petitioner had failed to demonstrate that the photographic lineup was material or favorable to his defense. *Id.* The Court finds that Petitioner has not shown that the decision of the TCCA "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Therefore, Petitioner is not entitled to habeas relief on the basis of this claim, and his *Brady* claim will be **DISMISSED**.

### C. Remaining Ineffective Assistance of Counsel Claims

Petitioner also asserts a claim for ineffective assistance of counsel arising out of the assertion that trial counsel failed to properly object to the prosecution's allegedly improper comments during his trial, specifically during closing argument [Doc. 2-1 p. 22]. Additionally, Petitioner claims that trial counsel's failure to include a transcript in his motion for new trial with the appellate court constitutes ineffective assistance of counsel [Doc. 2-1 p. 26].

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687. Petitioner has the burden of showing both deficient performance and prejudice. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

Under the first prong of the test, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

In assessing counsel's performance, a court must presume that counsel's questioned actions might have been sound strategic decisions and must evaluate the alleged errors or omissions from counsel's perspective at the time the conduct occurred and under the circumstances of the particular case. *Strickland*, 466 U.S. at 689; *see also Vasquez v. Jones*, 496 F.3d 564, 578 (6th Cir. 2007) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]") (quoting *Strickland*, 466 U.S. at 690). Only when the challenged actions are "outside the range of professionally competent assistance" will counsel's performance be considered constitutionally deficient. *Strickland*, 466 U.S. at 690.

The second prong requires the petitioner to show that counsel's deficient performance prejudiced the defense. *Smith*, 528 U.S. at 285–86. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. In order to prevail on a claim of prejudice, a petitioner must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. On balance, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." *Id.* at 686. While both prongs must be established to meet a petitioner's burden, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697.

When a petitioner raises an ineffective assistance of counsel claim in his § 2254 petition, the Court must review the state court's ruling on that claim under the highly deferential standard of the AEDPA. Thus, in order to succeed on a federal claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that the state court's ruling on his ineffective assistance of counsel claim was an unreasonable application of *Strickland*. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). "Surmounting *Strickland*'s high bar is never an easy task," and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (citing *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

The Court will address Petitioner's remaining ineffective assistance of counsel claims in turn, applying the above standard.

### 1. Failure to Properly Object

Petitioner claims that trial counsel was ineffective in failing to "object to and preserve for appellate review the multiple acts of prosecutorial misconduct of the district attorney general in both trial and closing arguments" [Doc. 2-1 p. 22]. Respondent maintains that the state court reasonably applied the *Strickland* standard in concluding that Petitioner was not entitled to relief on his claims of ineffective assistance of trial counsel [Doc. 15 p. 23–24]. Additionally, Respondent asserts that Petitioner is specifically challenging his trial counsel's failure to object to comments in the prosecution's closing argument, as Petitioner only cites to relevant portions of the trial transcript containing the closing argument [*Id.* at 23].

Petitioner raised this ground of ineffective assistance of counsel in his post-conviction proceedings in state court, but the TCCA denied relief as to his claim, holding:

> Although the petitioner claimed that he had a very tense relationship with trial counsel, trial counsel testified that he and the petitioner had a good working relationship and that he was always willing and receptive to meeting or speaking with the petitioner. The petitioner argues that trial counsel should have moved for a mistrial when Mrs. Senn mentioned the petitioner's time in prison, but trial counsel testified that the decision to continue with the trial was a joint decision with the petitioner, testimony that was accredited by the post-conviction court.

> With respect to the petitioner's claim that trial counsel should have objected to inflammatory remarks made by the prosecutor during closing argument, trial counsel testified that it was a strategic move based on his belief that some of the prosecutor's statements actually benefitted the petitioner, and we will not second-guess this reasonable trial strategy. As such, we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

*Winkler*, 2014 WL 545479, at *10 (internal citation omitted).

The Court finds that Petitioner has not shown that he is entitled to relief under the AEDPA on this claim. First, the TCCA's determination was not "contrary to" *Strickland* because the TCCA applied its two-part test to the facts. Second, the TCCA's ineffective assistance determination was not based on an unreasonable determination of the facts or an unreasonable application of

*Strickland*'s standards to those facts. *See* 28 U.S.C. §§ 2254(d). Further, the state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1), which Petitioner has not submitted.

Therefore, because the Court finds that the TCCA reasonably concluded that counsel did not perform deficiently at trial by failing to object to specific statements during trial, Petitioner is not entitled to relief on this claim, and it will be **DISMISSED**.

### 2. Failure to File Transcript of Motion for New Trial

Petitioner also claims that "trial counsel completely abandoned his interests . . . by counsel failing to file the entire record of the proceedings in the [TCCA]" [Doc 2-1 p. 26]. Respondent maintains that Petitioner "incorrectly claims that this issue is procedurally defaulted" [Doc. 15 p. 29]. Moreover, Respondent asserts that Petitioner has failed to present clear and convincing evidence to overcome the presumption of correctness afforded to the TCCA's denial of Petitioner's claim [*Id.*].

Petitioner raised this ground of ineffective assistance of counsel in his post-conviction proceedings in state court, but the TCCA denied relief as to this claim, holding:

> In our view, the record supports the post-conviction court's denial of relief. With respect to the preparation of the appellate record, the petitioner notes that the issues in his original appeal included the trial court's alleged error by prohibiting impeachment of Mr. Senn with a prior conviction and by permitting the State to question Mrs. Senn about the threatening voicemail message. This court declined to review either of those issues due to the appellants' failure to include in the record the transcript from the hearing on the motion for new trial. The fact that trial counsel failed to prepare an adequate appellate record does not, standing alone, amount to ineffective assistance of counsel. First, as stated by the post-conviction court in its denial of relief, the petitioner "has failed to show what was specifically left out of the appellate record." Second, and more importantly, the petitioner has failed to establish how he was prejudiced by this failure.

*Winkler*, 2014 WL 545479, at *9 (internal citations omitted).

The TCCA properly identified the applicable standard from *Strickland* and rejected Petitioner's ineffective-assistance claim on both its performance and prejudice prong. *Id.*; *see also Strickland*, 466 U.S. at 697. The state court's failure to spell out every step of its *Strickland* analysis does not affect the validity of its ruling under AEDPA. *Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."); *Harris v. Stovall*, 212 F.3d 940, 945 (6th Cir. 2000) ("Where a state court decides a constitutional issue . . . without extended discussion, a habeas court should then focus on the result of the state court's decision."). Neither the decision of the post-conviction trial court nor the subsequent decision of the TCCA was contrary to, or an unreasonable application of, existing Supreme Court precedent.

Petitioner cites *Wallace v. State*, 121 S.W.3d 652 (Tenn. 2003) to allege that the prejudice prong of an ineffective assistance of counsel analysis cannot be resolved "simply by reasoning that [Petitioner] had direct review of the issue of sufficiency of the evidence alone" [Doc. 2-1 p. 27]. However, review under the AEDPA is limited to relief for claims that have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Further, Petitioner claims that "anything short of a complete transcript is incompatible with effective appellate advocacy." [3] [Doc. 2-1 p. 27]; *see Hardy v. United States.*, 375 U.S. 277, 288 (1964) (Goldberg, J., concurring). However, *Hardy* held that "a new court-appointed attorney who represents an indigent attorney on appeal (but not at trial) is entitled to the entire transcript at public

---

[3] In his memorandum of law in support of his § 2254 petition, Petitioner incorrectly cited *Ellis v. United States*, 356 U.S. 674 (1958) for this quote [Doc. 2-1 p. 27].

expense . . . ." *Jackson v. Renico*, 179 F. App'x 249, 252 (6th Cir. 2006) (citing *Hardy*, 375 U.S. at 279–80).

Ultimately, Petitioner has failed to demonstrate that the state court's adjudication of this claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court. Therefore, Petitioner is not entitled to habeas relief on the basis of this claim, and it will be **DISMISSED**.

### D.    Ineffective Assistance of Post-Conviction Counsel Claims

Lastly, Petitioner argues that his post-conviction counsel was ineffective in failing to "address the issue of discrimination" of the grand jury foreperson, failing to subpoena the Monroe County court clerk to give testimony on the selection process of the Monroe County grand jury foreperson, and by failing to argue "a new rule of law" relating to the use of a shock belt on Petitioner at trial [Doc. 2-1 p. 28]. Respondent alleges that these claims are without merit, as ineffective assistance of post-conviction counsel is not a cognizable ground for federal habeas relief [Doc. 15 p. 30–31].

Respondent correctly notes that, because there is no constitutional right to an attorney in state post-conviction proceedings, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. 722, 754 (1991). Under § 2254(i), the ineffective assistance of post-conviction counsel "shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i); *see, e.g.*, *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013). Accordingly, Petitioner has not demonstrated entitlement to relief as to these claims, and they must be **DISMISED**.

## V.    CONCLUSION

For the reasons set forth above, the Court finds that none of Petitioner's claims warrant issuance of a writ. Therefore, Petitioner's petition for a writ of habeas corpus [Doc. 2] will be **DENIED** and this action will be **DISMISSED**.

## VI.    CERTIFICATE OF APPEALABILITY

The Court must consider whether to issue a Certificate of Appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

After reviewing each of Petitioner's claims, the Court finds that Petitioner has not made a substantial showing of the denial of a constitutional right with respect to his *Brady* claim, his claim that trial counsel was ineffective in failing to object to alleged prosecutorial misconduct, or his claim that post-conviction counsel was ineffective. Further, reasonable jurists would not debate the Court's findings that several of Petitioner's claims are procedurally defaulted.

However, the Court concludes that reasonable jurists could disagree whether Petitioner has made a substantial showing of the denial of a constitutional right on Petitioner's claim of

ineffective assistance of trial counsel by failing to file a transcript in the appellate record. Therefore, Petitioner will be **GRANTED** a COA on that claim. As reasonable jurists could not disagree about the remaining issues, the Court **DENIES** a COA on Petitioner's remaining claims.

Federal Rule of Appellate Procedure 24(a)(3) provides that a party who was permitted to proceed *in forma pauperis* in the district court may proceed on appeal *in forma pauperis* unless the district court certifies that an appeal would not be taken in good faith or otherwise denies leave to appeal *in forma pauperis*. The Court **CERTIFIES**, pursuant to Fed. R. App. P. 24(a), that an appeal in this matter would be taken in good faith to the extent the appeal addresses the above-referenced issues for which the Court grants a certificate of appealability. An appeal that does not address these issues is not certified as taken in good faith, and Petitioner should follow the procedures of Fed. R. App. P. 24(a)(5) to obtain *in forma pauperis* status.

**AN APPROPRIATE ORDER WILL ENTER.**


_____
**UNITED STATES DISTRICT JUDGE**